UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| CHRISTINE A. LEROUGE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 4:19-CV-00087-SPM |
| | ) |
| | ) |
| | ) |
| ANDREW M. SAUL,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM OPINION**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Defendant Andrew M. Saul, Commissioner of Social Security (the "Commissioner") denying the application of Plaintiff Christine A. LeRouge ("Plaintiff") for Disability Insurance Benefits ("DIB") and Disabled Widow's Benefits ("DWB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (the "Act"). The parties consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 8). Because I find the decision denying benefits was supported by substantial evidence, I will affirm the Commissioner's denial of Plaintiff's application.

---

[1] On June 4, 2019, Andrew M. Saul became the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Commissioner Saul is substituted for Nancy A. Berryhill as defendant in this action. No further action needs to be taken to continue this suit by reason of the last sentence of 42 U.S.C. § 405(g).

1

## I. PROCEDURAL BACKGROUND

On December 7, 2015, Plaintiff applied for DIB and DWB, alleging a disability onset date of June 16, 2010. (Tr. 202, 211). On March 6, 2016, her applications were initially denied. (Tr. 103-11). On March 9, 2016, Plaintiff filed a Request for Hearing by Administrative Law Judge ("ALJ") (Tr. 113-15). On January 16, 2018, the ALJ held a hearing on Plaintiff's claims. (Tr. 45-85). On May 23, 2018, the ALJ issued an unfavorable decision. (Tr. 11-31). On July 9, 2018, Plaintiff filed a Request for Review of Hearing Decision with the Social Security Administration's Appeals Council. (Tr. 196). On November 20, 2018, the Appeals Council denied Plaintiff's request for review. (Tr. 1-6). The decision of the ALJ stands thus as the final decision of the Commissioner of the Social Security Administration.

## II. FACTUAL BACKGROUND

On February 3, 2016, Plaintiff completed a Function Report. (Tr. 282-89). She was working two hours a day, five days a week. (Tr. 286). She reported that she had tried to increase her responsibilities at work in different departments, but had to go back to two hours a day in accounting only. (Tr. 282). She took care of pets, took care of her personal care with no problems, prepared normal meals, and did most normal indoor cleaning; however, a neighbor took care of yard work, because it was too strenuous. (Tr. 284-85). She reported being able to walk, drive, shop in stores, pay bills, handle money, read, and spend time with others. (Tr. 285). She reported being unable to lift much weight, stand for long periods of time, or reach overhead. (Tr. 284, 287). She could stand for about an hour or so before needing to rest and could probably walk for a much shorter time. (Tr. 287). She reported no problems in the ability to squat, bend, sit, kneel, or climb stairs. (Tr. 287). She reported that she took several medications that caused her to have stomach problems and made her sleepy, and she reported waking up three or four times a night. (Tr. 288).

Almost two years later, on January 16, 2018, Plaintiff testified at the hearing before the ALJ. (Tr. 52-85). At that time, she was working about an hour a day, five days a week, doing bookkeeping at a department store. (Tr. 60, 62). She has tried to do more but cannot lift more than ten pounds or do most of the physical work. (Tr. 63). When she gets home, she has to take a nap before she can do chores. (Tr. 60). Plaintiff shares with her 24-year-old daughter household responsibilities like cooking, cleaning, and laundry, but a neighbor does outdoor chores. (Tr. 68). She reads, watches television, drives, and shops. (Tr. 69-70).

Plaintiff had an aortic valve replacement in 2010. (Tr. 58). She testified that in the 18 months before the hearing, her valve had been having "blowback more and more." (Tr. 58). She had a catheterization because of this. (Tr. 58-59). Her cardiologist's decision has been to watch the valve a little longer before doing another replacement, which she thinks will be within the next year. (Tr. 59).

Plaintiff has been "just all around not feeling well, and not feeling right," with fatigue being one of her main problems. (Tr. 60). She had been feeling progressively worse in the past year. (Tr. 60). Plaintiff thinks she would be unable to do even sedentary work because she has limited stamina. (Tr. 67). She cannot function for longer than a three-hour period at one time, cannot sit up at a desk, gets winded, and cannot think clearly. (Tr. 66-67). Her vision also gets blurry. (Tr. 67).

Plaintiff also has migraine headaches about three to four times a month; they cause her to miss work about once a month. (Tr. 60-61). Plaintiff testified that the difference between a headache and a migraine for her is that when she gets migraines, her vision becomes blurry, she becomes nauseated, she usually throws up, and she is sensitive to light, whereas with a headache it just feels like her head is going to explode. (Tr. 54). At the time of the hearing, she was going to

3

her neurologist once every three months for Botox injections. (Tr. 55). Before her doctor started her on Botox injections, there she would have migraines causing her to be unable to get out of bed for three or four days at a time. (Tr. 60). In addition to the Botox injections, Plaintiff takes Butol, oxycodone, rizatriptan, and sumatriptan as needed for her headaches. (Tr. 64). She also takes simvastatin for cholesterol, metoprolol for blood pressure, Lexapro for anxiety, Trazodone for sleeping, and aspirin as a blood thinner. (Tr. 64-65). She does not take any other cardiac medications. (Tr. 65).

With regard to the medical and other evidence in the record, the Court adopts the facts as presented in the parties' respective statements of facts. The Court will cite to specific portions of the record as needed in the discussion below.

### III. STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled a person who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he [or she] lives, or whether a specific job vacancy exists for

4

him [or her], or whether he [or she] would be hired if he [or she] applied for work." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. § 404.1520(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. § 404.1520(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. § 404.1520(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 404.1520(e). At Step Four, the Commissioner determines whether the claimant can return to his or her past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his or her past relevant work, the claimant is

not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g), 404.1560(c)(2); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he or she is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 404.1560(c)(2).

### IV. THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ here found that Plaintiff met the insured status requirement of the Act through December 31, 2010, that she is the unmarried widow of a deceased insured worker, that she attained age 50 on September 16, 2015, and that she met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Act as of September 16, 2015. (Tr. 14). The ALJ found that Plaintiff did not engage in substantial gainful activity between June 16, 2010, the alleged onset date of disability, and October 31, 2016, the end of the prescribed period. (Tr. 14). The ALJ found that Plaintiff had the severe impairments of residual effects of aortic valve replacement, migraine headaches, and obesity, and that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (Tr. 15-18). The ALJ found that Plaintiff had the RFC "to perform sedentary work as defined in 20 CFR 404.1567(a), with the following additional limitations: she could not climb ladders, ropes, or scaffolds; and she

6

should never be exposed to unprotected heights or hazardous machinery. (Tr. 19). At Step Four, the ALJ found Plaintiff was unable to perform any past relevant work. (Tr. 28). However, at Step Five, relying on the testimony of a vocational expert, the ALJ found that there are other jobs existing in significant numbers in the national economy that Plaintiff could perform, including representative occupations such as data entry clerk (Dictionary of Occupational Titles No. 203.582-054, 150,000 jobs nationally) and word processor/typist (Dictionary of Occupational Titles No. 203.362-010, 90,000 jobs nationally). (Tr. 29-30). Thus, the ALJ found that Plaintiff was not under a disability, as defined in the Act, from June 16, 2010, through the date last insured of December 31, 2010, or between the potential onset date of September 16, 2015, and the end of the prescribed period, October 31, 2016. (Tr. 30).

### V. DISCUSSION

Plaintiff challenges the ALJ's decision on two grounds: (1) that the ALJ failed to fully and fairly develop the record by obtaining medical opinion evidence regarding Plaintiff's heart condition and headaches; and (2) that the ALJ erred by failing to properly evaluate whether Plaintiff's headaches medically equaled the requirements set forth in Listing 11.03.

As the parties agree, the issue in this case is whether Plaintiff was disabled between September 16, 2015, and October 31, 2016 (the "relevant period").

#### A. Standard for Judicial Review

The decision of the Commissioner must be affirmed if it "complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); *see also* 42 U.S.C. § 405(g); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the

agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Pate-Fires*, 564 F.3d at 942. *See also Biestek*, 139 S. Ct. at 1154 ("Substantial evidence . . . means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'") (quoting *Consolidated Edison*, 305 U.S. at 229).

In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012). However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

### B. The ALJ Did Not Fail to Fully and Fairly Develop the Record

Plaintiff's first argument is that the ALJ failed to fully and fairly develop the record by obtaining medical evidence that addresses Plaintiff's physical ability to function in the workplace and that supports the RFC assessment. Specifically, Plaintiff argues that the ALJ should have further developed the record by ordering a consultative examiner or medical expert to interpret the significance of Plaintiff's heart valve replacement and certain highly technical test results related

to Plaintiff's heart condition. Plaintiff also suggests that the ALJ should have obtained a medical opinion to determine whether Plaintiff's headaches and migraines equaled Listing 11.03; that argument will be addressed in the next section.

"Well-settled precedent confirms that the ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004)). This duty may require the ALJ to recontact medical sources or order consultative evaluations, but "only if the available evidence does not provide an adequate basis for determining the merits of the disability claim." *Sultan v. Barnhart*, 368 F.3d 857, 863 (8th Cir. 2004). "The ALJ does not 'have to seek additional clarifying statements from a treating physician unless a *crucial issue* is undeveloped.'" *Vossen*, 612 F.3d at 1016 (quoting *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)). Moreover, "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Id.* "[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995).

The ALJ "determines a claimant's RFC 'based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [her] limitations.'" *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004)). Additionally, "[b]ecause a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by 'some medical evidence' of the claimant's ability to function in the workplace." *Id.* (quoting *Steed v. Astrue*, 524 F.3d 872, 875 (8th Cir. 2008)); *see also Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016) ("A claimant's RFC is a medical question, and some medical evidence must support the

RFC determination."). Therefore, while the claimant "bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment," *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013), "[a]n ALJ is required to obtain additional medical evidence if the existing medical evidence is not a sufficient basis for a decision." *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994).

A review of the medical records dated during the relevant period demonstrates that no crucial issues were undeveloped with regard to Plaintiff's heart condition or headaches. The ALJ had ample evidence, including medical evidence, to support the RFC finding without obtaining the opinion of a medical expert.

The Court first notes that the ALJ did impose significant limitations on Plaintiff's physical ability to function, finding that she could perform only sedentary work with several additional limitations, including that she could not climb ladders, ropes, or scaffolds and should never be exposed to unprotected heights or hazardous machinery. (Tr. 19). The Eighth Circuit has emphasized that a limitation to sedentary work "in itself is a significant limitation." *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005).[2]

The Court next considers Plaintiff's primary argument—that the record was undeveloped with respect to her heart condition. Plaintiff had an aortic valve replacement in 2010 that required regular follow-up visits and testing with her cardiologist. (Tr. 426-28, 803-04, 809, 889-90, 892,

---

[2] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

895). However, as the ALJ reasonably considered, during the relevant period, Plaintiff's treatment notes reflect almost no reports of any heart-related symptoms to her cardiologist or other physicians. (Tr. 26-27). The few possible heart-related complaints that do appear in the record are mild and isolated: in November 2015, she told her primary care physician that she "had an episode of palpitations, but rare" (Tr. 427); and in October 2016, she told her cardiologist she had had a recent episode where she could feel her heart beating, but it was "not tachy or irregular." (Tr. 848). Aside from those complaints, Plaintiff's treatment notes during the relevant period are devoid of any mention of fatigue, lack of stamina, palpitations, chest pain, feeling winded easily, or other symptoms aside from headaches. To the contrary, Plaintiff consistently denied chest pain, palpitations, shortness of breath, and dyspnea (Tr. 427, 459, 490, 803, 844, 848, 889); her cardiologist noted in May 2016 that she was "exercising and feeling well" (Tr. 803); she told her primary care physician in July 2016 that she was doing cardio exercise five times a week (Tr. 841); and she told her primary care physician in October 2016 that she was exercising regularly (Tr. 846). As the ALJ noted, it was not until December 2017, more than a year after the relevant period ended, that Plaintiff began to complain to her doctors of fatigue, lack of stamina, and getting easily winded—the symptoms (other than headache) that Plaintiff claims render her unable to perform even sedentary work. (Tr. 22, 894-95). Moreover, aside from findings of heart murmur on a few occasions (Tr. 541, 844, 849, 890), most of Plaintiff's cardiovascular examinations were normal, with consistent findings of normal heart rate and rhythm (Tr. 428, 541, 543, 460, 804, 844, 849, 890), no edema (Tr. 459, 490, 543, 849), no carotid bruits (Tr. 541, 543), and no thrills (Tr. 541, 543). This evidence of only rare and and mild complaints, combined with the largely normal objective cardiovascular examination findings, fully supports the ALJ's finding that Plaintiff's heart condition did not render her unable to perform a limited range of sedentary work.

To support her argument that the ALJ needed a medical expert to interpret her treatment notes, Plaintiff points to certain technical terms and findings in her cardiologists' notes: diagnoses of bicuspid aortic valve, status post-aortic valve replacement, and palpitations (Tr. 425-26, 803); a November 2015 note of a 3/6 systolic murmur (Tr. 428); a November 2015 note that Plaintiff had "mild increase in AV gradients, but stable at this time on exam, will follow" (Tr. 428); a May 2016 note that Plaintiff had "AVR with increased gradients, peak 44 mmHg last year last year" (Tr. 804); and mentions in November 2015 and May 2016 of "prosthesis mismatch" (Tr. 428, 804). Plaintiff also points to a June 2016 transthoracic echocardiography report containing many findings, including "diastolic function assessment consistent with abnormal left ventricular relaxation (grade 1 diastolic dysfunction)." (Tr. 807). Plaintiff also cites a record from November 29, 2016 (about a month after the relevant period ended) in which Plaintiff's cardiologist noted a "loud systolic murmur" and noted that "[g]radients across the AVR have increased, with mean gradient now above 30 mm Hg. Will plan repeat TTE to ensure this valve is not narrowing even further. Possible some degree of PP mismatch, but gradient has increased sig over the last 6 months." (Tr. 890).

When viewed in context, these findings do not show any crucial issues were undeveloped with respect to the effects of Plaintiff's heart condition on her RFC. These findings were made in the context of Plaintiff's regular treatment with her cardiologist. It is clear that they were not associated with significant or ongoing symptoms, because at the times these findings were made, Plaintiff was denying cardiovascular symptoms and reporting feeling well and exercising. (Tr. 427-48, 803-804, 844, 846, 848-49, 889). Moreover, as the ALJ noted, Plaintiff's cardiologist did not prescribe any medication or suggest any surgical treatment in response to these findings; instead, he simply made notes such as, "mild increase in AV gradients, but stable at this time on

exam, will follow" (Tr. 428) and "[v]alve is stable, will follow" (Tr. 809) and advised Plaintiff to continue making follow-up appointments every six months. In addition, as the ALJ noted, Plaintiff's cardiologist did not advise Plaintiff to limit her activities in any way based on those findings. (Tr. 804). It was not until December 2017, long after the relevant period ended (and when Plaintiff began complaining of significant symptoms), that Plaintiff's cardiologist indicated that she might be getting "fairly close" to needing a repeat valve replacement procedure. (Tr. 894-95) In light of the numerous notes consistently indicating that Plaintiff did not have ongoing or significant symptoms associated with her heart condition, the lack of limitations placed on her by her treating cardiologist, and the largely normal objective examination findings in the record, the medical record was sufficiently developed with respect to Plaintiff's heart condition for the ALJ to reach his RFC finding. The ALJ did not need to obtain the opinion of a medical expert.

The Court also finds that the record was sufficiently well developed with respect to Plaintiff's headaches that the ALJ did not need to obtain additional evidence. It is undisputed that Plaintiff suffered from migraines and other headaches both during and after the relevant period and sought treatment for those conditions. However, the ALJ reasonably found that the medical evidence regarding Plaintiff's headaches during the relevant time frame supported the RFC assessment, because it showed that her headaches were largely controlled with medication. (Tr. 22-23). On the first day of the relevant period, September 15, 2015, Plaintiff established care with a neurologist for her headaches and reported worsening headaches, some with nausea and vomiting; the neurologist prescribed Topomax, Fioricet, Lexapro, and Maxalt. (Tr. 457-62). At her next visit, on December 16, 2015, the neurologist noted that "[s]ince her last visit she has been doing much better now that the medication is in her system" and that she had not had to take Maxalt or Fioricet on a regular basis. (Tr. 485). At Plaintiff's visit to her primary care physician

on December 29, 2015, she reported tension headaches, but she reported no worsening of symptoms and indicated that over-the-counter medication worked when needed. (Tr. 542). The record then contains no treatment records related to headaches for almost six months. When Plaintiff returned to her neurologist in June 2016, she reported an episode in May in which she had an eight-day-long headache or migraine; she also reported having multiple headache episodes a week and taking her Fioricet three to four times a week. (Tr. 917). Her neurologist noted that she suspected Plaintiff had developed an analgesic rebound-type headache and counseled Plaintiff on reducing her headache regimen; she also changed Plaintiff's dosages and medications. (Tr. 921). On July 14, 2016, Plaintiff's primary care doctor noted that Plaintiff's migraines were "controlled with daily Topamax and PRN Maxalt and Fiorcet," and that she had had "no migraines since last month when dosage of Topamax was changed." (Tr. 841). It was also noted that she tolerated her current medications without recognized side effects. (Tr. 841). The last mention of headaches during the relevant period was at Plaintiff's annual physical on October 29, 2016, when her primary care doctor noted that Plaintiff's migraines were cyclical and that neurology was managing her medications. (Tr. 846).

As the ALJ correctly noted, the record shows that Plaintiff's migraine headaches worsened significantly after the relevant period ended. (Tr. 23, 923-24, 858, 929, 939, 941). However, the above notes support the ALJ's conclusion that Plaintiff's headaches, *during the relevant period*, were generally well-controlled with medication and thus were not disabling. *See Hensley v. Colvin*, 829 F.3d 926, 933 (8th Cir. 2016) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.") (quoting *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009)).

Plaintiff is correct that the record contains no opinion evidence from any medical source with regard to Plaintiff's physical ability to function in the workplace. However, the absence of

such evidence does not necessarily require remand. It is well established that "there is no requirement that an RFC finding be supported by a specific medical opinion." *Id.* at 932 (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013), & *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)). Moreover, the Eighth Circuit has found that "[i]n the absence of medical opinion evidence, 'medical records prepared by the most relevant treating physicians [can] provide affirmative medical evidence supporting the ALJ's residual functional capacity findings.'" *Id.* (quoting *Johnson v. Astrue*, 628 F.3d 991, 995 (8th Cir. 2011)). Accordingly, the Eighth Circuit has found that on the particular facts of a case, mild or unremarkable objective medical findings and other evidence may constitute sufficient medical support for an RFC finding, even in the absence of any medical opinion evidence directly addressing Plaintiff's ability to function in the workplace. *See, e.g.*, *Stringer v. Berryhill*, 700 F. App'x 566, 567-68 (8th Cir. 2017) (affirming a finding that the claimant was not disabled; noting, "While there were no medical opinions, it appears the medical evidence would have supported even a less restrictive RFC"); *Hensley v. Colvin*, 829 F.3d at 929-34 (upholding the ALJ's finding that the plaintiff could perform sedentary work despite the absence of specific medical opinion evidence; finding "adequate medical evidence of [the plaintiff's] ability to function in the workplace" where the plaintiff's treating physician found that the plaintiff was in no acute distress and had a normal knee exam and gait; another physician found that his knee assessment was normal and he had "full knee range, good lower limb and spinal flexibility"; and the plaintiff reported greatly reduced or nonexistent knee and back pain after treatment).

Here, as in the above cases, the largely normal objective examination findings during the relevant period, combined with the absence of significant or ongoing complaints related to Plaintiff's heart condition, Plaintiff's own accounts of feeling well and exercising during the

relevant period, the evidence that Plaintiff's headaches were controlled with treatment, and the fact that Plaintiff's doctors did not place any limits on her activities, constituted substantial evidence, including medical evidence, in support of the ALJ's finding that Plaintiff could perform sedentary work with some additional limitations. With the medical record adequately developed, the ALJ was not required to seek opinions from Plaintiff's treating physicians or order a consultative examination.

### C. The ALJ Did Not Err in Analyzing the Listings at Step Three

Plaintiff's second argument is that the ALJ erred at Step Three of the evaluation by failing to evaluate whether Plaintiff's headaches equaled Listing 11.03 and by failing to obtain a medical opinion regarding the question of whether Plaintiff's headaches equaled Listing 11.03. Plaintiff also notes that although the ALJ determined that Plaintiff did not medically equal Listing 11.02, she provided no analysis for that finding.

At step three of the sequential evaluation process, an ALJ is required to analyze a claimant's medically determinable impairments to determine whether they meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1. 20 C.F.R. § 404.1520(a)(4)(iii). As the parties agree, and as the ALJ noted, there is no listing that pertains specifically to migraine headaches, and thus Plaintiff's migraine headaches cannot "meet" a listing. (Tr. 19, Pl's Br., Doc. 19, at 19). The ALJ found that Plaintiff's headaches did not medically equal the criteria of Listing 11.02. (Tr. 19).

Plaintiff argues that the ALJ was obligated to evaluate whether Plaintiff's headaches medically equaled Listing 11.03, relying on guidance from a Social Security Administration Question and Answer program. (Pl.'s. Br., Doc. 19, at 7-8.) As Defendant points out, however, the Social Security Administration revised the listings regarding neurological disorders in 2016 and

16

eliminated Listing 11.03. *See Revised Medical Criteria for Evaluating Neurological Disorders*, 81 Fed. Reg. 43048, 2016 WL 3551949 (July 1, 2016). The effective date of the revised listings was September 29, 2016, and the new rules apply to "claims that are pending on or after the effective date." *Id.* at 43048, 43051. The Social Security Administration also states that it "expect[s] that Federal courts will review the Commissioner's final decisions using the rule that were in effect at the time we issued the decisions." *Id.* at 43051 n.6. Because the ALJ's decision was issued after the effective date, the Court will review that decision based on the updated listings.

As recognized in Social Security Ruling ("SSR") 19-4p, the SSA now evaluates headaches under Listing 11.02. *See* SSR 19-4p, Evaluating Cases Involving Primary Headache Disorders, 2019 WL 4169635, at *7 (Aug. 26, 2019). Thus, ALJ properly evaluated Plaintiff's headaches under Listing 11.02, the listing that was in effect at the time of the decision, and the Court finds no error in the ALJ's failure to evaluate Plaintiff's headaches under inactive Listing 11.03. (Tr. 19). *See Tuggle v. Comm'r*, No. 2:18-CV-904107-NKL, 2019 WL 1980702, at *2-*3 (W.D. Mo. May 3, 2019) (considering a similar argument and finding no error in the ALJ's failure to consider inactive Listing 11.03 in evaluating migraines).

To the extent that Plaintiff challenges the ALJ's determination that Plaintiff's medical impairments did not medically equal Listing 11.02, the Court disagrees and finds the ALJ's determination was supported by substantial evidence. "To establish equivalency, a claimant 'must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'" *Carlson v. Astrue*, 604 F.3d 589, 594 (8th Cir. 2010) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990)). "The severity standards for Listing-level impairments are high, because 'the listings [for adults] were designed to operate as a presumption of disability that makes further inquiry unnecessary[.]'" *Malott v. Colvin*, No. 4:13-00877-CV-W-NKL, 2014 WL 2759421, at *3

(W.D. Mo. June 18, 2014) (quoting *Sullivan*, 493 U.S at 532 (1990)). The claimant has the burden of proving that his or her impairment meets or equals a listing. *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004).

Plaintiff first suggests that the ALJ may have erred by failing to include a specific discussion of the basis of his finding that Plaintiff's headaches did not medically equal Listing 11.02. However, the Eighth Circuit has recognized that "[t]here is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record." *Boettcher v. Astrue,* 652 F.3d 860, 863 (8th Cir. 2011). Here, the ALJ's conclusion is well supported by the record.

SSR 19-4p provides guidance regarding how to evaluate whether a headache disorder medically equals Listing 11.02:

> Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing.
> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).
> Paragraph D of listing 11.02 requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked limitation in one area of functioning. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02D, we consider the same factors we consider for 11.02B and we also consider whether the overall effects of the primary headache disorder on

> functioning results in marked limitation in: Physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing pace; or adapting or managing oneself.

2019 WL 4169635, at *7.

Thus, to establish that her headaches equal either Listing 11.02B or 11.02D, Plaintiff must show headaches whose severity is equal to a dyscognitive seizure occurring at least once every two weeks for three consecutive months despite treatment. As discussed above, however, evidence during the relevant time period shows that Plaintiff's headaches were responsive to treatment, and there is no indication that she had headaches that were both frequent and severe over any consecutive three-month period. Plaintiff did complain of frequent headaches with associated nausea and vomiting at her first visit to her neurologist in September 2015, and she was prescribed several medications. (Tr. 457). However, at her next two visits to her doctors, she reported that she was doing much better with her medications and reported that over-the-counter medication worked when needed; she also did not mention any phenomena such as nausea, vomiting, or photophobia associated with any headaches she was having. (Tr. 485, 542). In June 2016, Plaintiff reported a very severe headache or migraine lasting over a week that had occurred in May and reported currently having multiple episodes a week, as well as dizziness and gait disturbance. (Tr. 917-21). A month later, Plaintiff's doctor noted that she had had "no migraines since last month when dosage of Topamax was changed" and that her migraines were "controlled with daily Topamax and PRN Maxalt and Fioricet," that and that she tolerated her current medications without recognized side effects. (Tr. 841). At the final record dated during the relevant period, Plaintiff's primary care physician noted that her migraines were cyclical and neurology was managing medications; there was no discussion of severe or frequent headaches or associated phenomena. (Tr. 846).

Although Plaintiff certainly had headaches during the relevant period, some of which were very severe, Plaintiff simply has not met the high burden of showing that those headaches were so severe, frequent, and unresponsive to treatment that they were equal in severity to Listing 11.02. Rather, as the ALJ reasonably found, they were generally well-controlled by medication during the relevant period. Thus, the ALJ's determination that Plaintiff's headaches did not medically equal Listing 11.02 during the relevant period is supported by substantial evidence.

## VI. CONCLUSION

For all of the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **AFFIRMED**.

                                      SHIRLEY PADMORE MENSAH
                                      UNITED STATES MAGISTRATE JUDGE

Dated this 25th day of February, 2020.